UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

        Plaintiff,

   v.                                 CAUSE NO. 3:22-CV-831 DRL

KEYSTONE RV COMPANY,

        Defendant.

OPINION AND ORDER

This case illustrates one reason why the Americans with Disabilities Act (ADA) exists. Keystone RV Company terminated one of its front-end cap painters, Brandon Meeks, after he seemed to amass one too many absences for a medically necessary surgery. Most absences, including the final one, related to his rare medical condition that produced large and painful kidney stones. The Equal Employment Opportunity Commission sues Keystone for failing to accommodate Mr. Meeks reasonably.[1] Each party today requests summary judgment. The court grants summary judgment for the EEOC on liability and denies Keystone's motion as to the EEOC's requested relief.

BACKGROUND

At age 19, Mr. Meeks was diagnosed with cystinuria, a hereditary, chronic disease that causes kidney stones to develop [20-3 ¶¶ 2-3]. He typically passes a kidney stone once or twice per year, causing him severe pain [*id.* ¶ 3]. About once every two years, he develops a large kidney stone that requires surgical removal [*id.* ¶ 4]. The pain before surgery can be excruciating and prevent walking [*id.*]. Mr. Meeks had two surgical removals before 2017 [*id.* ¶ 7]. In 2017, he had to have five surgeries in two weeks to remove kidney stones from his kidneys and ureters [*id.* ¶ 6].

---

[1] The EEOC invokes the right of the government to bring this action against Keystone under 42 U.S.C. §§ 12117(a), 2000e-5(f)(1).

In August 2019, Keystone hired Mr. Meeks as a base coat cap painter at its Plant 35 in Wakarusa, Indiana, where he would paint the base coat on the front-end caps for fifth-wheel units [*id.* ¶¶ 12, 14]. He took this opportunity to build on his experience from painting planes during his service in the United States Navy; he also painted cars for his friends and paying customers [*id.* ¶¶ 9-10]. Ty Mitchell directly supervised Mr. Meeks at Plant 35 [*id.* ¶ 12]. Mr. Mitchell reported to Plant Manager Jason Griffith [20-4 Tr. 28; 20-5 Tr. 16]. Manager Griffith reported directly to Manufacturing (General) Manager Brian Maurer, who oversaw the entire plaint [20-6 Tr. 18-19].

Keystone's handbook includes an attendance policy that counts any absence, tardy, or leave early "not excused in whole by Keystone policy or law" as an "attendance occurrence" (also called a "point") [20-7 Tr. 125; *id.* PDF 28 (Ex.3)]. According to the policy, the company will terminate an employee who accrues seven attendance points within an employee's current anniversary year [*id.* PDF 28 (Ex. 3)]. Keystone allows an employee to miss up to three consecutive days stemming from one doctor's note and accrue just one point without applying for an ADA accommodation [*id.* Tr. 109-10]. Manager Griffith was not aware that leave was also available for those with an ADA disability [20-5 Tr. 64].

Mr. Meeks was a diligent and hard worker. On October 17, 2019, he accrued his first attendance point from a non-medical appointment [20-3 ¶ 15]. On November 4, 2019, he accrued his second attendance point when he visited his urologist due to kidney stone symptoms [*id.* ¶ 16]. He received his third and fourth points when he missed work thereafter on November 6 and 8 due to kidney stone pain [*id.* ¶ 17]. He received his fifth point on November 12, when he sought treatment for kidney stone pain [*id.* ¶ 19]. His urologist sent him for a CT scan [*id.*]. His doctor recommended he remain off work until November 18, but Mr. Meeks returned on November 13 to avoid any further attendance points [*id.* ¶¶ 19, 22].

On November 13, Mr. Meeks collapsed in excruciating pain in a restroom at Plant 35 [*id.* ¶ 22]. Mr. Mitchell ran to check on Mr. Meeks and make sure he was okay [20-4 Tr. 153-54]. Manager Maurer

also appeared and called for an ambulance (he works part-time as a medic) [20-6 Tr. 81]. An ambulance took Mr. Meeks to the hospital [20-4 Tr. 147]. Manager Griffith was aware that Mr. Meeks fell in the bathroom and left in an ambulance [20-5 Tr. 110-12]. Manager Maurer rode with Mr. Meeks in the ambulance and learned that he had kidney stones too large to pass [20-6 Tr. 83]. Mr. Meeks was absent from November 13-15 and assessed one attendance point [20-5 Tr. 124-25]. This was his sixth attendance point [*id.* Tr. 124].

Mr. Meeks' urologist told him that he had a golf-ball-sized kidney stone in his left kidney that needed to be surgically removed through his back [20-3 ¶ 25]. Mr. Meeks returned to work on November 18, and Manager Griffith warned Mr. Meeks through an employee warning notice that a seventh attendance point would lead to termination [20-5 Tr. 125; *id.* PDF 29 (Ex. 15)]. Mr. Meeks informed his supervisor, Mr. Mitchell, that he had a golf-ball-sized kidney stone that needed surgery and two weeks of leave [*id.* Tr. 109-10, 151-52]. Mr. Mitchell in turn advised Manager Griffith of this information [*see id.* Tr. 109-10, 151-52]. On December 5, the surgeon sent a letter indicating that the surgery was scheduled for December 16 and that Mr. Meeks needed two weeks off work [20-15].[2]

Keystone typically shuts down Plant 35 during December for at least a couple weeks [20-5 Tr. 71]. In 2019, Plant 35 shut down on December 17, and would not reopen until January 13, 2020 [20-6 Tr. 102; *see* 20-5 PDF 27 (Ex. 1)]. This meant that Mr. Meeks would miss just one day of work on December 16 due to his surgery [20-3 ¶ 33]. Mr. Meeks informed Keystone's manager of human resources, Christine Conrad, that he needed the day off for his surgery [20-7 Tr. 97]. After she spoke with Manager Griffith and Manager Maurer, discussing that Mr. Meeks had accrued six points already, the company approved the day off without assessing an attendance point [*id.* Tr. 99-100]. The company did not consider this a formal ADA accommodation because "he just needed the one day" [*id.* Tr. 100]. The company requested no paperwork beyond the doctor's note Mr. Meeks submitted [*id.* Tr. 101].

---

[2] This letter is in Keystone's possession, though the company does not know when it received it [20-8 at 1].

Mr. Meeks had his surgery on December 16 [20-3 ¶ 36]. When he was discharged from the hospital two days later, he was informed that a follow-up procedure would be necessary to remove remaining stone fragments and a ureteral stent [*id.* ¶ 37]. On January 10, 2020, his follow-up procedure was scheduled for January 24 [*id.* ¶ 38].

Mr. Meeks returned to work on January 13 [*id.* ¶ 39]. When he returned, Mr. Meeks informed the company that he needed another surgery on January 24 [20-5 Tr. 139; 20-3 ¶ 40]. Mr. Meeks says he told his boss, though Mr. Mitchell doesn't recall whether Mr. Meeks told him that he needed another surgery [20-3 ¶ 40; 20-4 Tr. 175]. According to Mr. Meeks, his boss responded, "We already looked out for you once. I'll see what I can do" [20-3 ¶ 40]. Manager Griffith says Mr. Mitchell told him that Mr. Meeks needed another surgery [20-5 Tr. 139]. Manager Griffith was aware that surgery was needed on January 24 [20-8 at 4]. He "assumed" it was because of the kidney stone issue [20-5 Tr. 152]. He had no reason to doubt that Mr. Meeks needed another surgery [*id.* Tr. 153]. That said, Manager Griffith did not request any medical documentation for this request [20-8 at 6].

Manager Griffith says he discussed the situation with the human resources manager [20-5 Tr. 129], though she says human resources never heard about the request [20-7 Tr.120]. Their miscommunication compounding the situation, the day before the surgery Manager Griffith forecasted to Mr. Meeks that he would be terminated if he missed and could reapply after 60 days per company policy [23-5 Tr. 102; 23-14 at 3; 23-12 Tr. 115, 118]. Manager Griffith claims that Mr. Meeks did not provide a return-to-work date [23-9 ¶ 4], but it seems he never had this conversation with Mr. Meeks. He says someone at Keystone asked the manager if Mr. Meeks had a return date and that Mr. Meeks "couldn't provide one," but he doesn't know who asked Mr. Meeks this question [20-5 Tr. 131-32]. When asked if he knew if anyone else asked him for a return date, he said "I sure don't" [*id.* Tr. 132]. Though he doesn't know who asked Mr. Meeks, he speculated that the human resources manager and Mr. Mitchell had a

4

conversation with Mr. Meeks, letting him know that they had to let him go because he didn't have a return date [*id.* Tr. 139-41].

Before the surgery, Mr. Meeks knew he could likely return to work on Monday, January 27, 2020—the next business day—but would need at most a week off [20-3 ¶ 44]. According to Mr. Meeks, he never communicated this timeline to Keystone because Keystone "never asked" [23-5 Tr. 92].

Mr. Meeks underwent his second surgery on January 24, 2020 [20-3 ¶ 50]. That afternoon, Mr. Meeks' mother drove him to Plant 35 to pick up his weekly paycheck, but he was sent to the corporate office [*id.*]. At the corporate office, Mr. Meeks was informed he had been terminated due to his attendance points [*id.* ¶ 51]. Manager Griffith made the decision [23-9 ¶ 5]. Mr. Meeks asked for the information in writing, and the receptionist at the corporate office wrote a letter to that effect in front of him [23-5 Tr. 86-87]. Manager Griffith recalled to Manager Maurer in an email on February 5, 2020, that he told Mr. Meeks that he was terminated because Mr. Meeks couldn't provide a return-to-work date, and that he could reapply after he figured out his health issues [23-9 ¶ 5; *id.* PDF 4 (Ex. A)].

The human resources manager says Manager Griffith should have asked Mr. Meeks if he needed an accommodation and contacted human resources, who then would have worked with Mr. Meeks to see if an accommodation could be worked out [20-7 Tr. 121, 123]. Manager Griffith remembers it differently. He assumes that Mr. Meeks did not give a return date, and this was communicated to human resources which then said he could not be accommodated without one [20-5 Tr. 128-29]. That said, Manager Griffith does not know if the human resources manager spoke with Mr. Meeks [*id.* Tr. 129].

Mr. Meeks felt well enough to return to work on Monday, January 27, 2020 [20-3 ¶ 45]. He needed additional surgeries on January 28 and February 12, 2020 [23-15 at 6]. Manager Griffith says he could have "absolutely" accommodated as much as two weeks off for Mr. Meeks at the plant, provided human resources approved the request [20-5 Tr. 153-54]. Upon his termination, Mr. Meeks lost his health insurance, life insurance, and 401(k) benefits [23-12 Tr. 108; 29-5 Tr. 86-87].

5

STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011). In a case involving crossmotions, each party receives the benefit of all reasonable inferences drawn from the record when considering the opposing party's motion. *Tegtmeier v. Midwest Operating Eng'rs Pension Tr. Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004).

DISCUSSION

A. *Americans with Disabilities Act (ADA) Claim.*

The ADA exists to eliminate "discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). It applies to qualified individuals "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Under the ADA, there are two types of discrimination claims: failure to accommodate and disparate treatment." *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 n.4 (7th Cir. 2015).

For an ADA failure-to-accommodate claim, the EEOC must show that Mr. Meeks was a qualified individual with a disability, his employer was aware of his disability, and his employer failed to accommodate his disability reasonably. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). A qualified individual with a disability is one who can perform the essential functions of the employment positions that the individual holds, with or without reasonable accommodation. 42 U.S.C. § 12111(8). ADA regulations allow an employer to apply "qualification standards" that result in adverse employment action to a disabled individual if they are "job-related and consistent with business necessity." 29 C.F.R. § 630.15(b)(1).

A "brief period of leave to deal with a medical condition could be a reasonable accommodation in some circumstances." *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017). But indefinite, prolonged leaves of absences are not reasonable accommodations. *See Oestringer v. Dillard Store Servs.*, 92 F. Appx. 339, 341 (7th Cir. 2004). An extended absence may render an individual unqualified. *See id.* at 341-42 (employee unqualified because she had already missed six consecutive weeks when she asked for more time off without specifying the amount needed); *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1038 (7th Cir. 2013) (employee unqualified because she "had no final diagnosis, no prescribed treatment, and no anticipated date by which she could have been expected to attend work regularly even if she had been granted leave").

No one can reasonably dispute that Mr. Meeks was a qualified individual with a disability. Keystone knew of the disability. And Keystone failed to accommodate the disability reasonably. A reasonable jury could not find otherwise on this record. Keystone also has not argued that Mr. Meeks could not perform his essential job duties while at work. By all accounts, he was a good worker.

Instead, Keystone argues that Mr. Meeks' request for leave without a return date rendered him unqualified because he could have been out of work indefinitely. But the evidence doesn't show that this was the case of an individual with an indefinite recovery timeline such that he was unqualified. *See*

7

*Oestringer*, 92 F. Appx. at 341; *Basden*, 714 F.3d 1038. Quite to the contrary, his history shows he returned promptly. Before his last request, he had missed just nine days of work. Once more he could return promptly the Monday after his Friday surgery. Though doctors forecasted additional surgeries on January 28, 2020 and February 12, 2020, no evidence suggests he needed more than a single day off for each of these surgeries [23-5 Tr. 91 (testifying that he usually just "walk[s] out of the office" after a stent removal)]. Manager Griffith affirmed that the company could have "absolutely" accommodated as much as two weeks of leave [*see* 20-5 Tr. 153-54]. No reasonable jury could find that Mr. Meeks was unqualified.

Keystone argues that there is no evidence that human resources would have approved the accommodation, but that falls far short of showing that the proposed accommodation would have put an undue hardship on Keystone. *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 455 (7th Cir. 2013) (employer must show "that any and all accommodations would have imposed an undue hardship"). Keystone failed to accommodate Mr. Meeks' disability reasonably, and a reasonable jury could draw only this conclusion on this record.

If Mr. Meeks needed an accommodation and Keystone could have accommodated him, one glaring question remains: why wasn't an accommodation given? "The employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). "[C]ourts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Id.*

Employers have an "affirmative obligation to seek the employee out and work with [him] to craft a reasonable accommodation." *Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 638 (7th Cir. 2020). "The employer has to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996). "[T]he failure to engage in the interactive process required by the ADA is not an independent basis for liability under the statute, and that failure is actionable only if it prevents identification of an appropriate accommodation for a qualified individual." *Basden*, 714 F.3d at 1039. But "an employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by intentionally remaining in the dark." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 804 (7th Cir. 2005). As an example of a shortcoming, the employer in *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1061-62 (7th Cir. 2014), fired an employee upon learning of her condition and general request for an accommodation without speaking to her or her doctor.

That said, "an employee who fails to uphold [his] end of the bargain—for example, by not clarifying the extent of [his] medical restrictions—cannot impose liability on the employer for its failure to provide a reasonable accommodation." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 840 (7th Cir. 2012) (quotations omitted). A "request as straightforward as asking for continued employment is a sufficient request for accommodation." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694 (7th Cir. 1998).

The EEOC argues that Keystone shoulders the blame for the breakdown in the interactive process because Mr. Meeks alerted the company that he needed time off for his surgery, and the company terminated him without ever asking for a doctor's note or working with Mr. Meeks to find a reasonable amount of time to take off for work—even after Mr. Mitchell told Mr. Meeks that he would "see what [he] could do" [20-3 ¶ 40] and even after prior knowledge of his needs [20-5 at 152-53]. Keystone blames Mr. Meeks because, though he says he felt well enough to return to work the next workday after his first follow-up surgery and didn't expect to need more than a week off work before the surgery, he never

communicated these facts to Keystone. Keystone notes that even when Mr. Meeks was told the day before the surgery that he would be terminated, he still did not provide an estimated return date.

No reasonable jury could find in Keystone's favor for its role in the interactive process. Mr. Meeks initiated a conversation, even providing his surgery date. Keystone had historical knowledge of his prompt returns to work. Giving all reasonable inferences in Keystone's favor, the evidence shows at best that Mr. Meeks simply omitted a return date—not that he concealed a return date or refused to give one when asked. There is no evidence on this record that Mr. Meeks was asked for a return date. Manager Griffith offers pure speculation, but that will not defeat summary judgment; and even his speculation is soundly debunked by the human resources manager who says she never heard of Mr. Meeks' request for accommodation from the Keystone team. *See Tousis v. Billiot*, 84 F.4th 692, 696 (7th Cir. 2023) (speculation will not create a triable issue of fact). Keystone adduces no evidence that Mr. Meeks was asked to provide a return date before his termination.

Keystone nonetheless argues that the fault in the interactive process lies with Mr. Meeks, for he privately knew he would not need more than a week's leave. But that argument ignores that Mr. Meeks initiated the conversation and Mr. Mitchell told him that Mr. Meeks would see what he could do, only for Manager Griffith to tell Mr. Meeks that the company had to terminate him and that he could reapply in sixty days after he figured things out. Well before termination there should have been a request for a doctor's note or some other discussion with Mr. Meeks that would have resolved the timeline and allowed human resources to properly assess the request. This was a simple and expected task. It was the employer's duty. Keystone had no right to "intentionally remain[] in the dark." *Sears*, 417 F.3d at 804. "Where notice is ambiguous as to the precise nature of the disability or desired accommodation, but it is sufficient to notify the employer that the employee may have a disability that requires accommodation, the employer must ask for clarification." *Id.* A reasonable jury could not lay the fault at Mr. Meeks' feet.

10

Keystone says it provided Mr. Meeks a reasonable alternative by offering him the opportunity to reapply in sixty days after his termination to allow him time to figure things out. Termination with the hope of rehire is not a reasonable alternative, particularly when Mr. Meeks lost pay and benefits upon termination. *See Watt v. Brown Cnty.*, 210 F. Supp.3d 1078, 1083 (E.D. Wis. 2016) ("terminating a person with a disability because they cannot return to work without any limitations ignores the mandate of the ADA that employers must make reasonable accommodations for individuals with disabilities"). As the EEOC argues, if Keystone could wait sixty days and rehire Mr. Meeks without issue, then it proves puzzling why Keystone would need to terminate him at all. Termination is an adverse employment action, not a reasonable accommodation. No reasonable jury could find in Keystone's favor on Mr. Meeks' ADA claim. The court grants summary judgment in the EEOC's favor on ADA liability.

B. *Mitigation of Back Pay Damages.*

The ADA allows a prevailing plaintiff to recover back pay as a form of equitable relief. 42 U.S.C. § 1981a(a)(2); 42 U.S.C. § 2000e-5(g)(1). "The district court has broad equitable discretion to fashion back pay awards to make the [discrimination] victim whole." *David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir. 2003). The court "must respect the findings implied by the jury's verdict" when deciding whether and to what extent to award back pay. *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 501 (7th Cir. 2000). This includes the jury's findings on whether the employee mitigated his damages. *Smith v. Great Am. Restaurants, Inc.*, 969 F.2d 430, 438 (7th Cir. 1992). The defendant bears the burden of proof that the plaintiff failed to mitigate his damages. *Gaffney v. Riverboat Servs.*, 451 F.3d 424, 460 (7th Cir. 2006).

To prevail on a mitigation defense, the employer must prove both that the employee was "not reasonably diligent in seeking other employment" and that "with the exercise of reasonable diligence there was a reasonable chance that the [employee] might have found comparable employment." *United States EEOC v. Gurnee Inn Corp.*, 914 F.2d 815, 818 (7th Cir. 1990). Comparable employment is "virtually identical promotional opportunities, compensation, job responsibilities, working conditions and status as

11

the position from which [he] was discharged." *Hutchison v. Amateur Elec. Supply*, 42 F.3d 1037, 1044 (7th Cir. 1994).

An employee "cannot just leave the labor force after being wrongfully discharged in the hope of someday being made whole by a judgment at law." *Id.* An employee "need not go into another line of work, accept a demotion, or take a demeaning position." *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1202 (7th Cir. 1989). He need not "seek employment which is not consonant with his particular skills, background, and experience or which involves conditions that are substantially more onerous than his previous position." *Id.* (quotation marks omitted). This task "does not require success, but only an honest, good faith effort." *Smith*, 969 F.2d at 438. But "absent special circumstances, the rejection of an employer's unconditional job offer ends the accrual of potential backpay liability." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 241 (1982).

Keystone requests summary judgment on the EEOC's request for back pay from the time of Mr. Meeks' termination on January 24, 2020 through the time he obtained comparable employment on October 1, 2022. Keystone first argues that Mr. Meeks rejected an unconditional offer of reinstatement from Keystone, ending the accrual of back pay from the start. But Keystone didn't make an unconditional offer of reemployment. Keystone cites Manager Griffith's affidavit that he told Mr. Meeks to reapply when he figured things out [23-9 ¶ 5]. Manager Griffith testified that Mr. Meeks was let go "with the assumption" that he would be rehired [23-7 at Tr. 139-140]. Manager Mauer said that all Mr. Meeks had to do "was come back in and apply, and [Keystone] would give" his job back [23-12 Tr. 108]. Keystone argues that its "invitation to reapply after his recovery was akin to an unconditional offer of employment," but it wasn't. An invitation to reapply is just that. It isn't an offer. And it isn't unconditional. Mr. Meeks' decision not to reapply doesn't stop the accrual of back pay on this record.[3]

---

[3] Keystone also cites Mr. Meeks' deposition testimony in which he says that Manager Griffith told him that "after sixty days per their policy I could return back to work" [23-5 Tr. 102]. Given its ambiguity in context and the lack

Keystone also argues that no reasonable jury could find that Mr. Meeks exercised reasonable diligence in his employment search. Mr. Meeks applied for jobs at ten companies from January to March 2020 [23-5 at 120-28]. Keystone takes issue with Mr. Meeks blindly walking into these establishments without knowing if they were hiring, but Keystone would be hard-pressed to argue that no reasonable jury could find an honest, good faith effort to find employment on Mr. Meeks' part. *See Smith*, 969 F.2d at 438. Canvassing many establishments would not be unreasonable; even those not hiring one day might be hiring the very next.

That said, Mr. Meeks didn't apply for any job from March 2020 until sometime in 2021 [23-15 at 12-13]. In July 2020, a motorcycle accident left him in a boot and a scooter, but he says he was able to work [*see* 23-5 Tr. 137]. Nothing explains why he didn't try to find comparable employment on an ongoing basis. In 2021 until October 2022, Mr. Meeks applied to four companies [*id.* Tr. 128-31]. He otherwise performed odd jobs [*see* 29-1 at 20]. On October 1, 2022, Mr. Meeks joined the construction company Crider & Crider as an equipment operator [23-5 Tr. 147-48; 23-15 at 4]. The EEOC considers Mr. Meeks' position at Crider & Crider comparable employment [23-15 at 12]. In the first two months post-termination, Mr. Meeks' search was "earnest and extensive," but after that his search "slowed to a trickle." *Payne v. Sec. Sav. & Loan Assn., F.A.*, 924 F.2d 109, 111 (7th Cir. 1991) (affirming failure to mitigate after search slowed). His search post-March 2020 seems far from reasonably diligent, assuming comparable work was available.

To end the accrual of back pay beyond March 2020, Keystone must also show that comparable work was available from March 2020 to October 2022, such that a reasonable jury could find that Mr. Meeks had a reasonable likelihood of obtaining that employment. In addition to his employment as a cap painter for Keystone at $24 per hour [23-6], Mr. Meeks had prior experience as an equipment operator

---

of any evidence of an unconditional offer on this record, including from Keystone's managers, this statement would not permit a reasonable jury's finding for Keystone.

[23-5 Tr. 12]. Keystone relies on three lines of evidence to support its argument that comparable work to Mr. Meeks' experience and pay was available. First, Keystone cites evidence that twenty-two companies in Northern Indiana were hiring during the relevant period [*see* 23-17; 23-18; 23-19; 23-20; 23-21]. These jobs all appeared in local newspaper advertisements in *The Goshen News*, *The Elkhart Truth*, and the *South Bend Tribune* [*see* 23-17; 23-18; 23-19; 23-20; 23-21].[4]

In the *South Bend Tribune*, Sampson Fiberglass Manufacturing ran an advertisement on January 13 and 29, 2021, that Sampson was hiring in all departments with competitive wages and a bonus program [23-20 at 6, 8]. Sampson ran an advertisement on December 20, 2021 that the company had immediate openings for gel coaters at $20 per hour, choppers at $20 per hour, and rollers at $18 per hour [*id.* 10]. On February 11, March 2, and April 13, 2022, Sampson ran an advertisement that it had immediate openings in all departments plus road repair [*id.* 12-13; 23-21 at 4]. On May 6, 2022, Sampson ran an advertisement for immediate openings in all departments including choppers [23-21 at 6]. On July 14, 2022, Sampson ran an advertisement for immediate openings in rollers and final finish [*id.* 8]. On September 8, 2022, Sampson ran an advertisement for immediate openings in rollers and gel coaters [*id.* 10]. On October 20, 2022, Sampson ran an advertisement for immediate openings in rollers [*id.* 12]. On March 6, 2020, Greater Mishawaka Auto Auction ran an advertisement for auto detailers with experience preferred but not a must [23-20 at 4].

In *The Goshen News*, Superior Axle ran an advertisement for "production work" on March 20, May 13, and July 14, 2021 [23-17 at 8, 12, 14]. On February 26 and March 20, 2021, Thor Motor Coach ran

---

[4] The EEOC argues that Keystone cannot properly authenticate these newspaper advertisements, but newspapers are self-authenticating under the federal rules. *See* Fed. R. Evid. 902(6) (self-authenticating evidence includes "[p]rinted material purporting to be a newspaper or periodical."). The EEOC also challenges these advertisements as inadmissible hearsay under Federal Rule of Evidence 802. Keystone argues that it does not offer these advertisements for their truth, but to support that there was a reasonable likelihood that Mr. Meeks would have found comparable employment, whether the jobs were in truth available to him or not. And it only matters whether these materials could be rendered admissible. *See Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014). Keystone may rely on these advertisements for that purpose.

an advertisement for openings in is Elkhart plant for metal, slide outs, electrical, shelling, plumbing, cabinet shop, repair, final finish, body repair, lamination, and welding (with experience preferred) [*id.* at 6, 8]. On April 29, 2021, Independent Protection Co. ran an advertisement for a production position with competitive wages and good benefits [*id.* 10]. On April 7, 2022, Prolon Incorporated ran an advertisement for machine operators, with first shift starting at $750/week and second shift starting at $850/week [*id.* 22]. Keystone counts six other companies that posted advertisements in *The Goshen News* from May 2020 to June 2022, though it doesn't cite or specify which advertisements it refers to [*see* 29-1 at 15]. That brings the total jobs cited in *The Goshen News* to ten.

In *The Elkhart Truth*, on May 22, May 30-31, and June 18, 2020, Dynamic Packaging ran an advertisement for assembly positions, first and second shifts, at $10.50 per hour [23-18 at 6, 8, 10]. American Millwork ran an advertisement for machine operators, lumber inspector, moulder set-up, and general labor on June 19, 2020 [*id.* 11]. Keystone counts eight other companies that posted advertisements in *The Elkhart Truth* from January 2020 to May 2022, though it doesn't cite or specify which advertisements it refers to [*see* 29-1 at 16]. That brings the total jobs cited in *The Elkhart Truth* to ten, and the overall number of jobs cited by Keystone to twenty-two.

The EEOC takes issue with the fact these opportunities arose in Northern Indiana, about ninety minutes from Mr. Meeks' Benton Harbor, Michigan home, and Mr. Meeks would not have the benefit of riding with coworkers like he did for his Keystone job [23-5 Tr. 103]. But the EEOC asserts that Mr. Meeks' employment at Crider & Crider in Bloomington, Indiana—a four-hour drive from his Benton Harbor home—is comparable employment [*see id.* Tr. 148]. The distance of these other jobs won't preclude a finding of comparable employment in the same area that Mr. Meeks held his Keystone job, though the factfinder may find this less indicative of comparable work.

Keystone cites two cases to argue that these newspaper advertisements are sufficient as a matter of law. In *Williams v. Imperial Eastman Acquisition Corp.*, 994 F. Supp. 926, 931 (N.D. Ill. 1998), the court

15

noted that it was "undisputed that comparable employment was available." Classified advertisements over three months in the *Chicago Tribune* revealed 118 positions in quality assurance inspection for persons of the plaintiff's qualifications. *Id.* In *Meyer v. United Air Lines*, 950 F. Supp. 874, 878 (N.D. Ill. 1997), classified advertisements over three years in the *Chicago Daily Law Bulletin* revealed 566 jobs available in legal fields that fit the plaintiff's previous work. Nearly 600 jobs over three years are a far cry from 22 jobs over two years, particularly when a showing has not been made that each of these jobs was in fact comparable. *See Coleman v. Lane*, 949 F. Supp. 604, 614 (N.D. Ill. 1996) (finding "copies of want-ads" insufficient without "evidence from any potential employer that an application from Plaintiff would have resulted in an offer" and "evidence of the specific job qualifications sought by the potential employers and how they compare to Plaintiff's skills and background").

The EEOC argues that these advertisements are too bare to show comparable employment. Indeed, certain of these advertisements make no mention of pay, qualifications, or job duties. Whether these advertisements meet Keystone's burden to show comparable employment, they are enough to create a triable issue. They are by no means so certain that a reasonable jury must find for Keystone, however.

Keystone also cites Manager Maurer's statement that Keystone "and the rest of the RV industry were experiencing a large boom in sales" in 2020 and 2021, and "Keystone was having trouble getting enough people to fill is open positions" [23-16 ¶ 4]. Keystone also cites Manager Griffith's testimony that he could not get enough painters in 2019 and 2020 [23-7 Tr. 21-22]. Maybe the company should not have let one of its good workers go then, or extended an unconditional offer of employment to Mr. Meeks. This evidence speaks to Keystone's open positions. Evidence that Mr. Meeks could have reapplied to his former position may help Keystone, but it doesn't take the question out of a reasonable jury's hands, particularly when Mr. Meeks faced the prospect of an automatic 60-day layoff every time he accrued too

16

many attendance points, without the meaningful prospect of a reasonable accommodation, due to his health.

Keystone also cites evidence that Northern Indiana and Southwest Michigan had low unemployment rates during the relevant period [*see* 23-22 PDF 5, 7, 9 (showing that for December 2021, there was a 3 percent unemployment rate in South Bend-Mishawaka, Indiana area, a 4.2 percent unemployment rate in Niles-Benton Harbor, Michigan area, and a 1.7 percent unemployment rate in Elkhart-Goshen, Indiana area)].[5] Though this bears on the availability of employment generally, it doesn't speak to the availability of comparable employment. *See Hutchison*, 42 F.3d at 1044.

In sum, this record presents a factually mixed perspective of reasonable diligence during the relevant period and comparable employment. A jury must decide Keystone's mitigation defense.[6]

C. *Injunctive Relief.*

The ADA also provides for injunctive relief against a discriminating employer. 42 U.S.C. §§ 12117(a), 2000e-5(g). To obtain injunctive relief, evidence of widespread discrimination isn't required, and injunctive relief may be warranted even if the only evidence of discrimination is the particular claimant's case. *See EEOC v. Ilona of Hung.*, 108 F.3d 1569, 1578 (7th Cir. 1997) (statute "authorizing injunctive relief does not itself require that a pattern or practice of unlawful conduct be shown").

---

[5] The EEOC argues that these statistics should not be relied on by the court because Keystone needs an expert witness to explain the numbers to the jury, and Keystone has not disclosed an expert witness for such purpose. Rule 56 permits a "party [to] object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The federal rules "allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form." *Olson*, 750 F.3d at 714. These statistics could be presented in an admissible form, and potentially through judicial notice. *See GE Cap. Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1084 (7th Cir. 1997).

[6] The EEOC also briefly argues that the newspaper advertisements and the unemployment statistics should not be considered by the court on summary judgment because Keystone failed to timely disclose the evidence. *See* Fed. R. Civ. P. 37(c)(1). The EEOC makes no argument on the harm or prejudice flowing from the timing of the disclosure, having instead filed a separate motion to strike in violation of local rule. *See* N.D. Ind. L.R. 56-1(f). That said, because the court denies Keystone's motion even while considering the evidence, the EEOC is ultimately not prejudiced by the disclosure or its timing today.

Keystone isn't asking for summary judgment as a matter of law as to all forms of an injunction, just a general "obey-the-law" injunction. A general "obey-the-law" injunction that isn't tailored to the particulars of the case will typically be denied as too broad. *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 843 (7th Cir. 2013). A "request for an obey-the-law injunction must be evaluated with great care." *Id.* at 842. There must be evidence that "convinces the court that voluntary compliance with the law will not be forthcoming." *Id.* at 842. The court must consider "whether the employer's discriminatory conduct could possibly persist in the future." *Id.* at 840. Obey-the-law injunctions have been upheld "when the victorious employee remains at the company or has been reinstated; where the particular employees or supervisors responsible for the illegal conduct remain at the company; and/or where the employer has taken some particular action—like withdrawing an accommodation policy—that convinces the court that voluntary compliance with the law will not be forthcoming." *Id.* at 842-43.

Keystone sets its sights on the complaint's request that the court permanently enjoin Keystone from "employment practices that discriminate against employees on the basis of disability" and "failing to engage in the interactive process to accommodate the known disabilities of its employees" [1 ¶¶ A-B]. Keystone first argues that this is an obey-the-law injunction and thus cannot be ordered. But an obey-the-law injunction is not automatically improper. *See AutoZone*, 707 F.3d at 843. Indeed, one factor that might support an obey-the-law injunction is present—the employee responsible for the illegal conduct is still employed by Keystone. *See id.* Given that the EEOC's "interests are broader than those of the individuals injured by discrimination," *EEOC v. Harris Chernin, Inc.*, 10 F.3d 1286, 1291 (7th Cir. 1993), the court won't preemptively limit Keystone's injunction request simply because it is an obey-the-law injunction.

Keystone also argues that this request is too broad and extends to all of Keystone's plants though the established facts relate to a single incident. As of July 1, 2023, Keystone employed 4,460 employees across 45 manufacturing plants and its one corporate office [23-1 ¶ 3]. Additionally, Keystone argues that

a violation is unlikely to reoccur. Keystone has a disability accommodation policy that instructs its employees to contact their plant manager, supervisor, or human resource manager to then "engage in an interactive dialogue with the individual employee to verify the existence of a disability covered under the ADA . . . and determine which accommodations the Company can reasonably provide under specific circumstances" [23-3 at 14 (Keystone0000324)]. The human resources manager also attests that Keystone intends to conduct further training for its plant managers to ensure they understand the disability accommodation policy and that they should contact human resources when an employe requests a reasonable accommodation [23-1 ¶ 6].

The EEOC responds that Keystone's motion is premature, noting that the language in the complaint is broad by design as a pleading. The EEOC is right. Though liability has now been established, *see Harris Chernin*, 10 F.3d at 1292 (premature to dismiss request for injunctive relief at the motion to dismiss stage); *United States v. Spectrum Brands, Inc.*, 218 F. Supp.3d 794, 825 (W.D. Wis. 2016) ("rather than dismissing plaintiff's claim for injunctive relief at the pleading (or even summary judgment) stage, the more appropriate course of action is to evaluate proposed language for a permanent injunction under the familiar legal standard *and* a further development of the facts"), the court will deny Keystone's motion to preemptively limit injunctive relief because the court need not find a pattern of discriminatory conduct to enjoin a company, *see Ilona*, 108 F.3d at 1578-79. The court will address the EEOC's request for a permanent injunction at the appropriate time.

## CONCLUSION

Accordingly, the court GRANTS the EEOC's partial summary judgment motion [20] and DENIES Keystone's summary judgment motion [21] and the EEOC's motion to strike [30]. The factfinder will decide damages, including Keystone's mitigation defense.

SO ORDERED.

March 27, 2024                                             *s/ Damon R. Leichty*
                                                           Judge, United States District Court